UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No. 2:18-CR-101 JD

LAMONT COLEMAN

## OPINION AND ORDER

After a jury trial, Defendant Lamont Coleman was found guilty of conspiring to distribute heroin, in violation of 21 U.S.C. § 846; possessing a firearm as a felon, in violation of 18 U.S.C § 922(g)(1); and possessing with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) (Counts 1, 8, and 9 of the Third Superseding Indictment). The jury acquitted Mr. Coleman of Counts 2, 7, and 10 (distributing heroin on two separate occasions and possessing with intent to distribute cocaine base). The Government had previously dismissed Counts 3 and 4 (two distributing heroin offenses). In advance of the sentencing hearing, Mr. Coleman has made numerous objections to the Presentence Report ("PSR"), which the Court will address in this order.

### A. Background

The Drug Enforcement Agency ("DEA") and the Porter County Multi Enforcement Group had been investigating a heroin drug trafficking operation in Gary, Indiana, led by Mr. Coleman in cooperation with his then-girlfriend Katrina Owens. Mr. Coleman owned an apartment complex at 4104 Madison Street in Gary, where both of them lived, and a residence next door at 4120 Madison Street. Mr. Coleman used both properties for selling heroin. Leroy

Coleman (Mr. Coleman's uncle),[1] Augustine Pike, and Tony Petty, also lived in the apartment complex.

The DEA used confidential informants and undercover officers to make a number of controlled buys. They would call a cellphone that remained at the apartment complex. Most of the time, the phone was answered by Ms. Owens but sometimes by Mr. Coleman or the other residents in the apartment complex. Whoever answered the call would take heroin orders and tell the buyers of the price. A runner would then be dispatched—Leroy, Ms. Pike, or Mr. Petty—to deliver heroin to the buyer and to collect payment. Frequently, the runners made the deliveries in the vicinity of the apartment complex. As it pertains to this case, the conspiracy to distribute heroin ran from November 2017 through May 2018.

On August 28, 2018, law enforcement executed a search warrant at Apartment 1, 4104 Madison Street, where Mr. Coleman and Ms. Owens lived. Mr. Coleman and Ms. Owens were in the apartment. During the search, the agents found a loaded Glock 19c firearm (Serial # NLW237) under the mattress on which Mr. Coleman and Ms. Owens slept. In an adjacent office, they located $2,122 in cash, 15.9 grams of clonazepam pills and 3.451 grams of cocaine base. The agents also found a loaded Ruger model LC9s firearm (Serial # 328-19723) and several loose rounds of ammunition of miscellaneous calibers along with 11.5 grams of heroin inside of a shoe box.

The agents also searched the house at 4120 Madison Street, where they found a loaded pistol (Hi-Point model JHP .45 caliber firearm—Serial # X4202637) in a dresser drawer within a northwest bedroom. On the floor next to it was a duffle bag with miscellaneous ammunition and magazines. Another bedroom of the residence contained a small safe. Mr. Coleman provided a

---

[1] For clarity, the Court will refer to him as Leroy.

combination for the safe which contained $19,270. Also, there were several letters inside the residence that were addressed to Mr. Coleman.

At trial, the Government subpoenaed Ms. Owens to testify. On the morning of her testimony, Ms. Owens informed the Government's lead agent, Task Force Officer Dave Murray, that "a third-party individual had reached out to her and provided information and direction from Lamont Coleman in reference to her testimony." (Hrg. Tr. at 27.) She was concerned about receiving on her cell phone images of DEA records with certain sentences highlighted in yellow. The images were sent by Jenaee Monae. The highlighted text in the first image read that "Leroy was not pleasant and stated he would not testify"; "I'm not testifying"; "He continually said he would not testify." (Gov't Ex. 1; Hrg. Tr. at 31.) The second image contained the highlighted text with references to Ms. Owens's subpoena: "On April 8th, 2021, TFO Dave Murray and Detective Bryan Slatton served trial subpoenas to Katrina Owens and Leroy Coleman;" "When TFO Murray explained she was being asked to testify against Lamont Coleman, Owens began crying and said she was scared to testify." (Gov't Ex. 1; Hrg. Tr. at 32.) Next to this was a handwritten note in the margin: "You don't have to do nothing you don't want to do." (*Id.*) The screenshots originated from a Facebook account owned by Mr. Coleman as indicated by his profile picture (a photograph of a dog). (Gov't Ex. 1; Hrg. Tr. at 33.)

After speaking with Ms. Owens, the agents accessed the jail's phone system (Telmate) where Mr. Coleman was being held. They located two phone calls of interest. The first phone call was between Mr. Coleman and a woman, who according to Officer Murray was most likely his sister (Hrg. Tr. at 38), taking place the day before Mr. Coleman's trial was to begin. During the conversation, Mr. Coleman is telling her to take pictures of the documents in question and to give them to "Robinson" "on FaceBook." (DE 347-1, Jail Call Tr. at 1.) He then tells her to "pass

to old girl please." (*Id*. at 2.) The woman responds that "she blocked you," and Mr. Coleman then tells her to send the pictures to "Jenaee Monae" (*id*.) and to "tell her to send . . . to her" (*id*.). The woman confirms a little later in the conversation that "she said ok sure will" and then again that "[s]he sent to her . . . She did. She actually sent a screen shot showing that she sent the message." (*Id*. at 5)[2]

The second phone call was placed on the evening of the first day of the trial. The conversation begins between just Mr. Coleman and the same woman but she soon brings in Mr. Coleman's uncle, Leroy. While just the two of them are conversing, the woman explains that Leroy told her that he (Mr. Coleman) is not guilty:

> Leroy just said, Him (Leroy) and Trina who did everything you had nothing to do with nothin. I was like . . . he said trina and him was doing the operating and doing everything you aint have nothen to do with nothen. I'm like damn in the back of my head if I had that recorded you would be out.

(DE 347-2, Jail Call Tr. at 1.)

After hearing this, Mr. Coleman asks the woman to speak to Leroy. After a short pause, she brings Leroy on the line and Mr. Coleman tells Leroy that "I wish you woulda came in the court room and said that." (*Id.*) He also tells Leroy that he has Leroy's statement to the police and that he knows Leroy is supposed to testify. He continues by saying to Leroy that he had nothing to do with the drug dealing:

> (unintelligible) you and trina (unintelligible) I didn't have nothin to do with it, but they got two phone calls that they think me you know what im saying. I guess all I want you to go in there and say like, that you don't know who that is it ain't me (unintelligible)

As Leroy exclaims in agreement, "Right, yeah," Mr. Coleman continues:

---

[2] Here and elsewhere, the spelling and punctuation are as they appear in the transcript.

> (unintelligible) is that him on the phone is that him on the phone naw that aint him
> on the phone.

(*Id.* at 2.)

Leroy then responds in agreement:

> Naw they aint . . . you at school and work. Me and trina did the operation ya know.
> I built the operation you know.

Hearing this, Mr. Coleman says, "Yeah that's it." Leroy then adds about his purported

involvement in the drug dealing:

> I built the operation ya know I had tony and short body doing runnings and shit ya
> know like that ya know. And they turned informant I knew they was taking videos
> and shit and all the shit ya know.

(*Id.*)

Lamont then responds that if Leroy testifies like that, he will be out tomorrow:

> That's what they got they some how trying to throw me in that shit because they
> want everybody. All you gotta do is go in there and tell them that. And ill be out
> tomorrow shit.

(*Id.*)

There's a little more back and forth before they finish the conversation, with Mr. Coleman

reiterating that Leroy should repeat at trial what Leroy just said:

> Why don't you go in there and tell them what you just told me or whatever and ill
> be out.

(*Id.* at 3.)

Leroy responds with a "yup" and they wrap up their conversation.

Neither party called Leroy to testify at trial. The Government found him to be unreliable

"because he continually changed his story after speaking with [Mr. Coleman] or anyone else

from the family." (Hrg. Tr. at 44.) As for Ms. Owens, despite her reservations, she did testify in

the Government's case-in-chief. She told the jury that Mr. Coleman was the head of their drug

dealing operation, who made all the decisions and supplied the "drug phone" and the drugs. Ms. Owens testified that, at his direction, she handled the heroin sales when Mr. Coleman was not at home and would turn over to him the proceeds, although sometimes she used the money to buy personal things. (Gov't Exhibit 8, Trial Tr. at 126.) She employed Leroy, Ms. Pike, and Mr. Petty as drug runners. She said that any guns in the apartment belonged to Mr. Coleman as she did not like guns. She identified Mr. Coleman as answering the drug phone in one of the wire-tapped phone calls. (*Id.* at 131–132.) Finally, she testified that, before meeting him, she wasn't involved in the drug dealing, and that she was young and naïve when she lived with Mr. Coleman.

At the evidentiary hearing, Mr. Coleman's counsel offered into evidence a purported affidavit from Leroy. The affidavit recounts some of the phone conversation between Leroy and Mr. Coleman and states that Leroy wasn't intimidated by Mr. Coleman:

> On or around April 28, 2021, I Leroy Coleman, during a phone call with Lamont R. Coleman stated that "me and Trina ran the operation. Lamont Coleman was either at work or at school. I also stated that I was caught on video and audio conducting drug transactions." Lamont R. Coleman did not threaten, intimidate, or unlawfully influence my statements."

(Def.'s Ex. A.) The Government objected to the admission of the affidavit and the Court took the matter under advisement.

At the evidentiary hearing, the parties also probed into the question of whether Mr. Coleman shot in the leg one of the drug runners, Mr. Petty. Such allegation is included in paragraph 28 of the PSR. Officer Murray testified that Mr. Petty told him during an interview that Mr. Coleman shot him in the leg inside the apartment complex as a punishment for skimming cash from the drug sales. (Hrg. Tr. at 23.) During his interview, Leroy confirmed that Mr. Coleman shot Mr. Petty. At the time of the shooting, Leroy took Mr. Petty to the hospital. At the hospital, Mr. Petty said nothing about being shot by Mr. Coleman, and instead told a

responding police officer that he was shot in a knee while walking near a liquor store. (Gov't Ex. 7, Gary Police Reports; Hrg. Tr. at 48.) Officer Murray did not obtain hospital records from the incident to determine what, if anything, Mr. Petty told the healthcare workers about him getting shot.

After their arrests, Ms. Pike, Mr. Petty, and Leroy gave statements to the police. Ms. Pike and Mr. Petty both indicated that Mr. Coleman and Ms. Owens answered the drug phone, took heroin orders, and then dispatched Ms. Pike, Leroy, and Mr. Petty to deliver the heroin to the customers.

On a different note, at the hearing, the Government has conceded that, contrary to its previous contention, Mr. Coleman isn't eligible for an armed career criminal enhancement under U.S.S.G. § 4B1.4(a). The Government now recognizes that Mr. Coleman lacks three predicate offenses for such an enhancement. (Hrg. Tr. at 7–9.)

### B. Discussion

Mr. Coleman makes multiple objections to the PSR, which the Court will now address. While the Court will discuss the specifics of each objection, it's worth noting that, "[a]s a general matter, to satisfy [the due process requirements], facts considered at sentencing must be proved by a preponderance of the evidence." *United States v. England*, 555 F.3d 616, 622 (7th Cir. 2009). At sentencing, the district court must rely on accurate and reliable information. *Id.*

#### (1) *Mr. Coleman's Role in the Drug Trafficking Organization*

Mr. Coleman objects to paragraph 4 of the PSR referring to him as a co-leader of "a heroin drug trafficking organization (DTO)." The Court will overrule the objection insofar as it

challenges Mr. Coleman's role but will grant the objection to the extent that the PSR describes Mr. Coleman's network of five persons as a DTO.

Neither the PSR nor the Government provide a definition of a DTO. The Department of Justice states that DTOs "are complex organizations with highly defined command-and-control structures that produce, transport, and/or distribute large quantities of one or more illicit drugs." Drug Trafficking Organizations, https://www.justice.gov/archive/ndic/pubs38/38661/dtos.htm (last visited on June 20, 2022). There's no evidence that Mr. Coleman ran an organization that would fit this definition. Accordingly, the Court will strike any references to a DTO in the PSR.

However, there was plentiful evidence at trial that Mr. Coleman was the leader among the five defendants charged in this case. As the facts laid out above show, Mr. Coleman asked Ms. Owens to deal heroin and cocaine for him and also employed three other persons as runners. Ms. Owens testified that she was inexperienced in drug trade and that Mr. Coleman controlled the supply of drugs and received the proceeds from the sales. He also supplied her with the "drug phone" and taught her the details of the operation. (*See* Trial Transcript at 120–124.) These facts are also consistent with the observations of the undercover officers and the confidential informant who purchased the drugs from Mr. Coleman.

(2) *Drug Orders*

Mr. Coleman objects to paragraph 5 of the PSR which states that Mr. Coleman sometimes answered the drug phone to take orders from clients. He claims that the Court cannot rely on this information because he was found not guilty of counts where the government claimed it was his voice on some of the recorded phone calls.

The Court overrules the objection, but notes that its ruling has no effect on either the guidelines calculations or the sentencing factors under 18 U.S.C. § 3553(a). The Court can consider Mr. Coleman's overall involvement in this case, notwithstanding the not guilty verdicts: "It is well established that a sentencing court may treat conduct for which the defendant has been acquitted as relevant conduct for guideline purposes." *United States v. Austin*, 806 F.3d 425, 433 (7th Cir. 2015). Trial evidence showed that Mr. Coleman would sometimes answer the drug phone. The Government played recorded calls made by undercover law enforcement officer to a phone number that the confidential informant testified was the number for Mr. Coleman, who went by the nickname KD. (Trial Tr. at 235.) In each call, a person responded to the name KD and subsequent to the conversations, drugs were delivered to the caller. In addition, both the confidential informant and the investigating officers identified Mr. Coleman's voice in those audio recordings and so did Ms. Owens. Therefore, paragraph 5 accurately reflects the evidence introduced at trial.

### (3) *The Location of the Drug Delivery on November 6, 2017*

Mr. Coleman objects to paragraph 6 of the PSR stating that, on November 6, 2017, Leroy delivered the drugs in front of Mr. Coleman's home. He claims instead that the drug deal took place a block away. This objection has no bearing on the guidelines calculation or the sentence that will ultimately be imposed upon Mr. Coleman and it's not necessary for the Court to rule on. While the Court has no specific recollection as to the exact location of this one drug deal, the evidence at trial showed that drugs were frequently delivered just outside of Mr. Coleman's dwelling.

(4) *Conduct Related to Acquitted Counts*

Mr. Coleman objects to paragraphs 9, 12, and 13 of the PSR arguing that any references to the conduct related to the acquitted counts should be deleted from the PSR. These paragraphs describe heroin sales and the amounts involved. The Court overrules the objection.

"An acquittal means that a charge has not been proved beyond a reasonable doubt, but a sentencing court may rely on facts established by a preponderance of the evidence. For purposes of calculating drug quantity, the offense level is determined by the amount of drugs attributable to the defendant during his entire course of relevant conduct, not simply the amount associated with the particular offenses of conviction. *United States v. Austin*, 806 F.3d 425, 433 (7th Cir. 2015) (citations omitted). Paragraphs 9, 12, and 13 accurately reflect the facts that the government has proved at trial by a preponderance of the evidence, albeit not beyond a reasonable doubt. An undercover law enforcement officer testified about setting up undercover buys and the government played audio and video recordings. Although Mr. Coleman wasn't visible in the videos, witnesses identified his voice on the calls, showing his involvement in the transactions. Moreover, after each phone call, drugs were delivered by the runners (Ms. Pike and Mr. Petty) to the purchasers, in the vicinity of Mr. Coleman's residence, at the quoted price and at quantities consistent with that price.

(5) *Mr. Coleman's Location at the Time of His Arrest*

Mr. Coleman objects to paragraphs 19 and 20, claiming that he wasn't present at 4120 Madison Street (the next door residence) at the time of his arrest and any references to his presence should be deleted. The Court overrules the objection.

Paragraphs 19 and 20 do not say that Mr. Coleman was physically present at 4120 Madison Street when he was arrested. Rather, the two paragraphs show the ties that Mr. Coleman had to the house at this address: officers found at the house mail addressed to Mr. Coleman and his ID, and Mr. Coleman was able to provide the combination to the safe at the house. Moreover, the surveillance throughout the investigation linked Mr. Coleman to the house, which he was seen entering for brief periods of time, especially after some of the drug orders. (Gov't Tr. Ex. 16; Trial Tr. at 62.)

(6) *Supplier of Drugs*

Mr. Coleman objects to paragraph 22 of the PSR stating that no trial evidence established that he provided Ms. Owens with drugs. The Court overrules the objection.

Mr. Coleman's objection is without merit. Ms. Owens testified at trial that Mr. Coleman got her involved in the drug dealing and provided drugs to her:

Q. And where did you get the heroin that you would give to Augustine or Tony?

[Ms. Owens]. From Lamont.

Q. How often would Lamont leave you a supply of drugs to dole out to Augustine or Tony or whoever was running the drugs?

[Ms. Owens]. It really depended on if I ran out and he would come and bring more. That's how we went.

Q. If you ran out, what would you do?

[Ms. Owens]. I would call him and let him know.

Q. And then would he bring more?

[Ms. Owens]. If he's not busy or whatever it was that he was doing, he would bring it. If he couldn't, I couldn't do nothing. So I would shut down the whole operation until he would come.

(Trial Tr. at 123–124.) The Court credits Ms. Owens's testimony as truthful and consistent with the overall evidence regarding Mr. Coleman's involvement in this case. In addition, some of the drugs were stored at 4120 Madison, presumably inside the safe to which Mr. Coleman had the password, and Mr. Coleman was seen numerous times going for a brief moment into the house just after the heroin orders were placed over the phone. Finally, Ms. Owens testified that she had never dealt drugs before and had no experience in the drug trade. (*Id.* at 121–22.) In other words, Ms. Owens had no means or expertise of obtaining on her own enough heroin to keep the sales going.

(7) *Aggravating Role*

Mr. Coleman objects to paragraphs 27 and 28 of the PSR and the resulting increase in the offense level under § 3B1.1(a). He claims there's no evidence showing that he exercised control over others in the conspiracy or that he was a leader of the operation. He also insists that there's no evidence that he shot Mr. Petty for skimming cash off the drug sales. The Court overrules the objection to the enhancement under § 3B1.1(a) and finds that a 4-level increase in the offense level is warranted.

Pursuant to § 3B1.1(a), "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," the offense level must be increased by 4 levels. This enhancement is supported by the trial evidence. The criminal activity involved five participants: Mr. Coleman, Ms. Owens, Ms. Pike, Mr. Petty, and Leroy. The latter three persons were the drug runners, who would deliver the drugs to the customers on the street at the behest of Mr. Coleman and Ms. Owens, after phone orders were placed. Apart from occasionally answering the drug phone when both Mr. Coleman and Ms. Owens were

absent, they did not have any other role in the operation and they certainly didn't exert any leadership. While Leroy claimed in the recorded jail-call conversation that he and Ms. Owens were the leaders of the operation,[3] this assertion contradicts Ms. Owens's trial testimony and the observations of the investigators during the surveillance of the operation. In addition, during their separate interviews, Mr. Petty and Leroy told the investigators that Mr. Coleman shot Mr. Petty in the leg for skimming the drug money, which demonstrates that Mr. Coleman had complete control over his runners. At the hearing, Mr. Coleman's counsel challenged this account by presenting evidence that, at the time of his injury, Mr. Petty told the police officers that he was shot by an unknown person while walking on a street. But this evidence isn't surprising given that Mr. Petty was likely afraid to turn on Mr. Coleman, and it is not surprising that Leroy, too, stayed silent about what happened. If anything, their fear of reporting Mr. Coleman to the police demonstrates Mr. Coleman's domination over them.

Also, as already noted above, Ms. Owens testified that Mr. Coleman was the leader of the operation. He asked Ms. Owens to deal the drugs for him. He provided her with the drug phone and heroin and instructed her how the individual sales should be conducted: answering the phone, directing the runners to deliver the drugs, collecting the money from the runners, informing him when they were out of drugs so he could resupply her, and so on. Although Ms. Owens was able to use some of the money from the drug sales for herself, she would generally turn over all of the proceeds to Mr. Coleman. Defense points out that Ms. Owens once deposited

---

[3] At the evidentiary hearing, Mr. Coleman submitted a purported affidavit from Leroy affirming that he made such statements during the phone conversation. While the Court allowed the defense to mark the affidavit as a hearing exhibit, the affidavit is not admissible into evidence. Leroy did not testify at the hearing and it is unknown whether he actually wrote the affidavit and whether it is actually notarized. In fact, no testimony was offered about the foundation for the affidavit so as to indicate any indicia about its reliability. But even if the affidavit were admissible, it would change nothing as what it states is inconsistent with the trial evidence about the roles of each member of the conspiracy.

$13,000 in her bank account and argues that she was the ring leader of the operation, but the evidence is inconsistent with that claim. Moreover, Ms. Owens testified that she deposited the $13,000 on Mr. Coleman's behalf and at his direction, even though the money was deposited in an account under her name. (Trial Tr. Vol. 1 at 148.) In summary, there's abundant evidence that Mr. Coleman, and not Ms. Owens, and certainly not Leroy, was the organizer and leader of the drug operation involving the five defendants.

### (8) *Obstruction of Justice*

Mr. Coleman objects to paragraph 24 of the PSR, arguing that he should not be getting a 2-level increase under § 2D1.1(b)(16)(D).[4] In the addendum to the PSR, the Government initially maintained that a 2-level increase under § 2D1.1(b)(16)(D) applied because Mr. Coleman "engaged in witness tampering." (DE 341 at 5.) The Government also argued in the alternative that a 2-level increase in Mr. Coleman's offense level was warranted under § 3C1.1 for obstruction of justice. However, in its post evidentiary hearing filings (DE 354 & 361), the Government only discusses § 3C1.1. It thus appears that the Government now believes that any increase in the offense level for Mr. Coleman's conduct in relation to its witnesses should be addressed under § 3C1.1.[5]

---

[4] Section 2D1.1(b)(16)(D) provides a 2-level increase in the offense level "[i]f the defendant receives an adjustment under § 3B1.1 (Aggravating Role) and [if among other things] . . . the defendant engaged in witness intimidation, tampered with or destroyed evidence, or otherwise obstructed justice in connection with the investigation or prosecution of the offense."

[5] In any case, while paragraph 24 mentions the 2-level enhancement under § 2D1.1(b)(16)(D), the actual offense level computation in paragraphs 36–47 does not include any enhancement under this provision. Instead, paragraph 43 adds two levels under § 3C1.1, although this section is nowhere else mentioned in the PSR. Therefore, the Court will limit its discussion for obstruction of the administration of justice within the confines of § 3C1.1.

Section 3C1.1 requires a 2-level increase in the offense level if a defendant obstructs the administration of justice:

> If—
>
> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and
>
> (2) the obstructive conduct related to
>
> > (A) the defendant's offense of conviction and any relevant conduct; or
> >
> > (B) a closely related offense,
>
> increase the offense level by 2 levels.

Application Note 4 provides "a non-exhaustive list of examples of the types of conduct to which this adjustment applies." One such example covers conduct that includes "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." App. Note 4(A) to § 3C1.1. "'[U]nlawfully influencing' a witness means intentionally engaging in conduct having a natural tendency to suppress or interfere with the discovery of truth." *United States v. House*, 551 F.3d 694, 699 (7th Cir. 2008) (citing *United States v. Wright*, 37 F.3d 358, 362 (7th Cir. 1994)). "[A]n effort to influence a witness's testimony—albeit vicariously—is a prototypical example of obstruction of justice." *United States v. Major*, 33 F.4th 370, 382 (7th Cir. 2022) (citing *United States v. Cheek*, 740 F.3d 440, 454 (7th Cir. 2014)). Even where a defendant is trying to urge a witness "to 'tell the truth' from his point of view, such conduct may still constitute obstruction of justice if its purpose is to persuade a witness or co-defendant to alter her testimony." *Id.* "The context of the statements is important." *United States v. Barber*, 937 F.3d 965, 972 (7th Cir. 2019). In short, "an attempt to influence a witness improperly is an attempt to obstruct justice under Guideline §

3C1.1 even if the defendant did not threaten the witness." *United States v. Wright*, 37 F.3d 358, 362 (7th Cir. 1994). Of course, "[m]aking any sort of statement to a witness is not enough; rather, a defendant must make the statement intending for it to affect whether or not the witness will appear at trial. At the same time, this circuit's cases hold that a mere attempt to influence a witness is enough, regardless of whether it succeeds." *House*, 551 F.3d at 699. The courts use "an objective standard to determine whether a given action is an attempt to obstruct justice, rather than evaluating the subjective intent of the defendant." *Id*. Section 3C1.1 "'requires specific intent to obstruct justice,' and the burden rests on the Government to establish such intent by a preponderance of the evidence." *United States v. Dale*, 498 F.3d 604, 608–09 (7th Cir. 2007).

Because Mr. Coleman orchestrated the sending of the summaries of the DEA interviews to Ms. Owens for the purpose of encouraging her to not testify, the PSR has properly increased his offense level by 2 levels pursuant to § 3C1.1, Although Mr. Coleman suggests that Jenaee Monae, or someone else, sent Ms. Owens the images on their own, for reasons known only to them, the evidence belies such assumption. First, there's no question that Mr. Coleman instructed over the jail phone the woman, who was likely his sister, to have Janaee Monae relay several images of the summaries of the DEA interviews to Ms. Owens. Mr. Coleman spoke with the woman the day before his trial was to begin. He told her to take pictures of the DEA documents, to send them to Jenaee Monae "on Facebook," and to tell her to send them to "her." Later in their conversation, his sister confirmed that Jenaee Monae had sent the pictures as requested. While Mr. Coleman understandably did not name Ms. Owens on the recorded phone line as the ultimate intended recipient of the images, it's no coincidence that Ms. Owens received from Jenaee Monae the pictures of the DEA reports about the same time as the jail call, and, as Mr.

Coleman's profile image indicates, the images originated from his Facebook account. Although there's no evidence that Mr. Coleman himself had access to his Facebook account, the woman with whom he spoke had such access, as the phone conversation shows. After all, she was able to see that Ms. Owens had blocked Mr. Coleman on Facebook, and that's why Mr. Coleman directed the woman to send the images to Ms. Owens in a round-about way: through Janaee Monae. (DE 347-1, Jail Call Tr. at 1–5.) The phone conversation matches up with what happened in the cyberspace, thus supporting the Government's contention that Mr. Coleman is directly responsible for sending the images of the DEA documents to Ms. Owens.

Next, Mr. Coleman argues that the images are innocuous and, in any case, they had no effect on Ms. Owens who testified against him at trial. That Ms. Owens testified is of no consequence. Mr. Coleman did not have to succeed in dissuading Ms. Owens from testifying in order to commit an obstruction of justice. It was sufficient that he attempted to do so. *See Wright*, 37 F.3d at 362 ("[A]n attempt to influence a witness improperly is an attempt to obstruct justice under Guideline § 3C1.1 even if the defendant did not threaten the witness."). The images, which came from Mr. Coleman's Facebook account, contained highlighted sentences that clearly suggested to Ms. Owens that she should not testify. The first image highlighted the sentences with emphasis that Leroy was refusing to testify:  "Leroy was not pleasant and stated he would not testify"; "I'm not testifying"; "He continually said he would not testify." (Hrg. Tr. at 31.) The second image clearly suggested that Mr. Coleman knew that Ms. Owens had been subpoenaed to testify at trial. (*Id*. at 32 ("On April 8, 2021, TFO Dave Murray and Detective Slatton served trial subpoena to Katrina Owens and Leroy Coleman.").) It also had a highlighted sentence referencing Ms. Owens's concern about her being asked to testify: "When TFO Murray explained she was being asked to testify against Lamont Coleman, Owens began crying and said she was scared to

testify." (*Id.*)  In their totality, the images convey the message that, "I know you've been subpoenaed, but you should not testify just like Leroy said he won't testify, and may you be reminded how worried you were when you first told that you will be asked to testify at trial." In addition, in the context of these messages, the handwritten note—"You don't have to do nothing you don't want to do"— sounds like encouragement not to testify. This amounts to unlawful influencing, which merits a two level increase under § 3C1.1. *See House*, 551 F.3d at 699 ("'[U]nlawfully influencing' a witness means intentionally engaging in conduct having a natural tendency to suppress or interfere with the discovery of truth.").

Besides the attempt to convince Ms. Owens to not testify, there was no other reason for Mr. Coleman to contact her, especially through third parties and by way of sending her the images of the DEA documents on the eve of the trial. By the time of trial, Ms. Owens was no longer in a relationship with Mr. Coleman. In fact, as the jail phone call reveals, she had blocked him on Facebook and he had no direct access to her. Although he did not dissuade her from testifying, she was very concerned about receiving the pictures, as Officer Murray testified. The fact that Mr. Coleman did not explicitly threaten her is immaterial. An offender cannot avoid liability merely because he chose the words carefully where the message is otherwise clear. *See United States v. Cheek*, 740 F.3d 440, 454 (7th Cir. 2014) (rejecting defendant's argument that a letter urging a witness to "tell the truth" was not obstructive, because in context it was reasonably seen as an attempt to sway or prevent harmful testimony); Barber, 937 F.3d at 972 (noting that defendant's inscription on a holding cell's bench "TELL ANTHONY CHIPPS TO THINK B4 H GET ON THERE N LIE" was more likely a communication of dissatisfaction with a co-conspirator's decision to testify against the defendant than a desire to warn him against perjuring himself). Accordingly, the Court finds that Mr. Coleman obstructed the administration

of justice with respect to prosecution of his offenses and his obstructive conduct related to his offenses of conviction. Therefore, a 2-level increase is warranted under § 3C1.1.

Likewise, the same increase is warranted in relation to his phone conversation with Leroy. Mr. Coleman argues that his statements to Leroy do not demonstrate his specific intent to affect Leroy's testimony in court and that the statements don't have a natural tendency to suppress or interfere with the discovery of the truth. (DE 360, Def.'s Resp. Br. at 10.) Both contentions are misplaced. Even assuming that Leroy came up on his own with the idea that he would testify at trial that he (Leroy) and Ms. Owens, not Mr. Coleman, were the leaders of the drug dealing operation, Mr. Coleman's encouraging him to lie about this fabrication amounts to obstruction of justice because he clearly intended to influence Leroy about his testimony at trial. The notion that Leroy was responsible for the drug trafficking runs contrary to Leroy's prior statements to the investigators as well as the overwhelming evidence at trial. Yet, Mr. Coleman did not just passively listen to Leroy muse that he was the leader of the operation; nor did he merely state an occasional interjection without intending to sway Leroy one way or other. Rather, he kept agreeing with Leroy with the intention that Leroy would repeat the lies on the witness stand. *See United States v. Cherif*, 943 F.2d 692, 703 (7th Cir. 1991) (a letter saying, "You know you're innocent and there is no way conceivable that you could have known anything about anything" was obstruction because it was a lie, seeking to influence the witness). What's more, he actively coached him what to say. Therefore, Mr. Coleman's statements to Leroy—such as "I guess all I want you to go in there and say like, that you don't know who that is it ain't me," and "Yeah that's it," and "All you gotta do is go in there and tell them that. And ill be out tomorrow shit"—are examples of influencing Leroy and reaffirming him in his intent to

lie under oath. In other words, Mr. Coleman's conduct in relation to Leroy was just as obstructive to the administration of justice as it was in relation to Ms. Owens.

Since the Government elected to prove the obstruction of justice under § 3C1.1 rather than under § 2D1.1(b)(16)(D), the Court will modify paragraph 24 of the PSR to show that the 2-level increase in Mr. Coleman's offense level is pursuant to § 3C1.1.

Mr. Coleman also objected to paragraph 24 for referencing "3 firearms being found within the residence, when, in fact, there were only two. Another firearm was located next door." (DE 341 at 5.) But paragraph 24 does not say that all three firearms were found inside Mr. Coleman's apartment. Rather, it states that "three firearms were located within the residences along with drugs." (DE 340, ¶ 24.) Thus, it is an accurate statement by Mr. Coleman's own account and his objection about the number of the firearms is therefore overruled. Although Mr. Coleman suggests that the firearms belonged to Ms. Owens, there was no such evidence at trial. Of course, given the location of the firearms in the apartment, Ms. Owens may have had access to them, but she adamantly testified that the guns did not belong to her and that she did not like guns because she lived among so much violence. (Trial Tr. Vol. 1 at 127 ("I don't like guns. I stay in an environment where it's nothing but gun violence, so I don't like guns at all.").) The Court credits Ms. Owens's uncontradicted testimony and finds that the firearms belonged to Mr. Coleman.

(9) *Armed Career Criminal Enhancement*

Mr. Coleman objects to paragraphs 29 and 30 of the PSR, arguing that he is not subject to an enhanced sentence as an armed career criminal under § 4B1.4 because he does not have three

predicate convictions.[6] In paragraphs 29 and 30, the PSR lists four of Mr. Coleman's previous convictions as predicates for the Armed Career Criminal assessment under § 4B1.4. They are drug-related convictions in two different cases in Illinois (Case Nos. 01CR1661502 and 11CR0022901)[7] and aggravated battery convictions in yet two other Illinois cases (Case Nos. 06CR0487901 and 06CR1661601).[8] After obtaining additional information on the drug-related convictions the Government now concedes that the drug-related convictions are not predicate convictions. Contrary to the representation in the PSR, which states that, in case number 11CR0022901, Mr. Coleman was convicted of two counts of manufacturing/delivery of heroin and cocaine, he was actually convicted of the lesser included offenses of possession (*see* DE 351-4, Gov't Ex. 4, Cert. Statement of Conviction at 10) which aren't predicates under § 4B1.4. *See* 18 U.S.C. § 924(e)(2)(A)(ii) (defining "serious drug offense" as "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance"). Furthermore, in case number 01CR1661502, he pleaded guilty to manufacturing/delivering of cocaine in violation of 720 ILCS 570/401(c)(2) (*see* DE 351-3, Gov't Ex. 4, Cert. Statement of Conviction at 3), which also does not qualify as a predicate conviction. *Cf. United States v. Ruth*, 966 F.3d 642, 650 (7th Cir. 2020) (finding that defendant's "2006 Illinois conviction under 720 ILCS 570/401(c)(2) is not a predicate 'felony drug offense'

---

[6] Section 4B1.4 states that a "[a] defendant who is subject to an enhanced sentence under the provisions of 18 U.S.C. § 924(e) is an armed career criminal." In turn, § 924(e) provides that, if "a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall [receive an enhanced sentence]."

[7] The PSR references these cases in greater detail in paragraphs 51 and 60.

[8] These two cases are identified in paragraphs 54 and 55 of the PSR

that triggers 21 U.S.C. § 841(b)(1)(C)'s sentencing enhancement"). Accordingly, the Court will sustain Mr. Coleman's objection and will strike paragraphs 29 and 30 of the PSR.

(10)   *Prior Felony Convictions*

The addendum to the PSR states that Mr. Coleman objects to paragraph 25 of the PSR which sets his base offense level at 24 due to him committing "the instant offense subsequent to sustaining at least two felony convictions of either a 'crime of violence' or a 'controlled substance offense." (DE 340 ¶ 25); *see* § 2K2.1(a)(2) (Applying base offense level of "24, if the defendant committed any part of the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense.") Paragraph 25 states that Mr. Coleman's predicate offenses are the same two felony convictions in Illinois for controlled substance offenses in case numbers 01CR1661502 and 11CR0022901 referenced above. Mr. Coleman argues that neither conviction can be counted toward § 2K2.1(a)(2) because they don't qualify as controlled substance offenses. The Government did not respond to Mr. Coleman's objection initially but, after obtaining Mr. Coleman's criminal records from Illinois, it maintains that the conviction in case number 01CR1661502[9] for manufacturing/delivering of cocaine in violation of 720 ILCS 570/401(c)(2) counts as a "controlled substance offense" for the purpose of determining Mr. Coleman's offense level under § 2K2.1(a)(2), even though it does not count under § 4B1.4 as a "serious drug offense." In addition, the Government now argues that the two Illinois convictions for aggravated battery—neither of which is mentioned in

---

[9] For ease of reading, the Court will refer to this case as the *502 conviction.

22

paragraph 25 of the PSR—do qualify as predicate offenses under § 2K2.1(a)(2).[10] Mr. Coleman did not respond to the Government's brief. The Court agrees with the Government that Mr. Coleman's *502 conviction qualifies as "controlled substance offense" and that his *901 and *601 convictions qualify as crimes of violence under § 2K2.1(a)(2).

The Court begins with the *502 conviction. On July 26, 2001, after a plea of guilty, Mr. Coleman was convicted of manufacturing/delivering cocaine in violation of 720 ILCS 570/401(c)(2) and sentenced to five years of imprisonment. He was released on March 31, 2003. As an initial matter, Mr. Coleman submits that this offense is too old to be counted, but his argument is without merit. Although it is true that "[a] sentence imposed more than fifteen years prior to the defendant's commencement of the instant offense is not counted unless the defendant's incarceration extended into this fifteen-year period," App. Note 1 to § 4A1.1, this exception has been met here. The conspiracy in the instant case spanned from November 2017 through May 2018. While Mr. Coleman was sentenced on July 26, 2001, more than sixteen years before he commencement of the conspiracy, his incarceration lasted until March 31, 2003, which is within the fifteen-year period provided in Application Note 1 to § 4A1.1.

Next, Mr. Coleman insists, without an explanation, that the *502 conviction does not qualify as a controlled substance offense. However, just two years ago, the Court of Appeals for the Seventh Circuit held that a conviction under 720 ILCS 570/401(c)(2) is a "controlled substance offense." *See United States v. Ruth*, 966 F.3d 642, 654 (7th Cir. 2020) ("Given the natural meaning of a controlled substance, [defendant's] 2006 cocaine conviction under [720 ILCS 570/401(c)(2)] is a controlled substance offense according to the career-offender

---

[10]The two convictions are in the above referenced cases 06CR0487901 and 06CR16661601. The Court will refer to them as the *901 and *601 convictions.

guideline."); *see also* § 4B1.2(b) ("The term 'controlled substance offense' means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) . . . ."). Accordingly, the Court finds that the *502 conviction qualifies as a predicate offense under § 2K2.1(a)(2) as a controlled substance offense.

The Court now turns to the two convictions for aggravated battery. As relevant here, "[t]he term 'crime of violence' means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that . . . has as an element the use, attempted use, or threatened use of physical force against the person of another." § 4B1.2(a)(1). "Under the framework of *Mathis v. United States*, [579 U.S. 500] (2016), the principal question is whether the statute under which the defendant was convicted is 'divisible' or 'indivisible.'" *United States v. Montez*, 858 F.3d 1085, 1092 (7th Cir. 2017). When the statute is indivisible, the Court lines up the crime's elements alongside with the definition of the crime of violence to see if they match. *Id*. If the statute is divisible, a "modified categorical approach" is then used "whereby 'a sentencing court looks to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." *Id*. (citing *Mathis*, 579 U.S. at 505–06). "The sentencing court then performs the same analysis as in the categorical approach, comparing the elements of that particular crime to the elements required for a 'crime of violence.'" *Id*.

On September 26, 2006, Mr. Coleman was convicted under the Illinois aggravated battery statute, 720 Ill. Comp. Stat. 5/12-4(b)(9), in the *901 case for an offense committed on February 10, 2006. (Order of Commitment and Sentence, DE 359-1 at 3.) The statute stated: "In committing a battery, a person commits aggravated battery if he or she . . . [k]nows the

individual harmed to be the driver, operator, employee or passenger of any transportation facility or system engaged in the business of transportation of the public for hire and the individual assaulted is then performing in such capacity or then using such public transportation as a passenger or using any area of any description designated by the transportation facility or system as a vehicle boarding, departure, or transfer location." 720 Ill. Comp. Stat. 5/12-4(b)(9) (2006). Also on September 26, 2006, Mr. Coleman was convicted under subsection (b)(18) of the same statute for a different offense committed on July 3, 2006, five months after the first offense. (Order of Commitment and Sentence, DE 359-1 at 4.) Under that subsection, a person commits aggravated battery if he knows "the individual harmed to be an officer or employee of the State of Illinois, a unit of local government, or school district engaged in the performance of his or her authorized duties as such officer or employee." 720 Ill. Comp. Stat. 5/12-4(b)(18) (2006). The underlying statute said that "[a] person commits battery if he intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 Ill. Comp. Stat. 5/12-3(a) (2006). The Seventh Circuit has "held that this statute is divisible and that violation of the first clause (the bodily harm clause) is a crime of violence, while violation of the second is not." *Montez*, 858 F.3d at 1092.

Here the Government provided both the indictments in each case and the sentencing documents which show that Mr. Coleman was in both instances convicted of the first clause of the statute (the bodily harm clause) for offenses that took place months apart. The indictment in the *901 case states that, in committing battery, Mr. Coleman "caused bodily harm to Juan Cuza, to wit: punched Juan Cuza about the body with his fists, knowing that he was an employee of any transportation facility . . ." (Indictment, DE 359-1 at 1.) Likewise, count 1 of the indictment

in the *601 case states that in committing battery, Mr. Coleman "caused bodily harm to Esteban Garcia, to wit: struck Estaban Garcia about the body, knowing him to be an officer of a unit of local government." (Count 1 of the Indictment, DE 359-2 at 2.) The sentencing documents show that he was convicted of the charges as brought. (DE 359-1 at 3; DE 359-2 at 4.) Finally, both offenses fall within the purview of § 4A1.2(e) in that they are counted for purposes of determining the base offense level to those prior felonies that receive criminal history points. *Cf. United States v. Garcia*, 37 F.4th 1294, 1306 (7th Cir. 2022) ("Application Note 10 to § 2K2.1 limits the prior felonies that a court may consider for purposes of determining the base offense level to those prior felonies that receive criminal history points.") In particular, as noted above, Mr. Coleman committed two separate offenses (the first on February 10, 2006, and the second on July 3, 2006) and was charged in two cases. He was convicted of each offense on September 26, 2006, and sentenced on the same day to two and three years of imprisonment, respectively. Under § 4A1.1(a), each of these convictions receive 3 criminal history points, *see* App. Note 1 to § 4A1.1, and, under § 4A1.2(a)(2), they are counted as separate offenses. Therefore, both convictions are properly considered under § 2K2.1(a)(2). *See* App. Note 10 to § 2K2.1 ( "For purposes of applying subsection . . . (a)(2) . . . , use only those felony convictions that receive criminal history points under §4A1.1(a) . . . . In addition, for purposes of applying subsection . . . (a)(2), use only those felony convictions that are counted separately under §4A1.1(a) . . . ." Accordingly, the Government has met its burden to show that Mr. Coleman committed the instant offense subsequent to sustaining at least two felony convictions for a crime of violence so that § 2K2.1(a)(2) applies. *See United States v. Shaffers*, 22 F.4th 655, 666 (7th Cir. 2022) ("A conviction under the first clause—for causing bodily harm—has as an element "the use, attempted use, or threatened use of force" and thus is a crime of violence . . . ."). With the

Government's burden met, the Court overrules Mr. Coleman's objection to the base offense level. However, since the Court finds that Mr. Coleman has three, not two, predicate offenses under § 2K2.1(a)(2), the Court will order that paragraph 25 of the PSR be modified consistent with the Court's findings.

    (11)    *Using a Firearm in Connection with Another Felony Offense*

Mr. Coleman objects to paragraph 26 of the PSR adding 4 levels to his offense level under § 2K2.1(b)(6)(B), arguing that there is no evidence that he used or possessed any firearms in connection with another felony offense. Also, in his sentencing memorandum, Mr. Coleman suggests that "at the time of his arrest, he did not actually possess or brandish any firearms." (DE 344 at 4.) The Court overrules the objection.

According to § 2K2.1(b)(6)(B), "[i]f the defendant used or possessed any firearm or ammunition in connection with another felony offense" the offense level must be increased by 4 levels. This provision easily applies in this case. First, the jury found Mr. Coleman guilty of possessing a firearm as a felon. Next, Application Note 14(B) to § 2K2.1 provides that "[s]ubsection[] (b)(6)(B) . . . appl[ies]. . . in the case of a drug trafficking offense in which a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia" because "the presence of the firearm has the potential of facilitating another felony offense or another offense." *See also United States v. Slone*, 990 F.3d 568 572 (7th Cir 2021) ("[E]ven without considering the drugs seized in the raid, the record contained abundant evidence that [the defendant] was dealing meth, and thus his guns had the "potential of facilitating" that activity."). Here, in Mr. Coleman's apartment at 4104 Madison, the agents found a loaded Glock pistol under the mattress that Mr. Coleman and Ms. Owens slept on. In an

adjacent office, the agents found $2,000, clonazepam pills, and cocaine base. A filing cabinet in the office contained a loaded Ruger pistol and ammunition. A shoebox in the same office contained heroin. In addition, a loaded firearm was located in the next door house that was owned by Mr. Coleman and which he visited with some frequency for short periods of time. Also, located in that house was a safe with $20,000 in cash. Moreover, Expert Witness Dave Zamora testified at trial that drug dealers use guns to protect themselves, their drugs, and their profits. There's no question, especially in light of Ms. Owens's testimony that the drugs were being doled out of Mr. Coleman's residence, that Mr. Coleman possessed the firearms to protect the drugs and to facilitate the drug trafficking operation. *See United States v. Waltower*, 643 F.3d 572, 578 (7th Cir. 2011) (there was ample evidence that § 2K2.1(b)(6)(B) applied where the gun was located in close proximity to 222 bags of crack, a grinder and scale, and a drug ledger and the gun was loaded and accessible). It's of no consequence that at the time of the early morning arrest, Mr. Coleman had no firearm on his person or that he did not brandish one. The evidence clearly establishes that he had control over the premises and the locations where the firearms were kept so that he is liable for possessing them. Although Mr. Coleman now suggests that Ms. Owens was the owner of those firearms, there's simply no evidence to support such contention, especially in light of Ms. Owens's testimony to the contrary.  Accordingly, the 4-level increase in Mr. Coleman's offense level under § 2K2.1(b)(6)(B) is warranted.

(12)    *Final Calculation*

In light of the Court's findings, Mr. Coleman's offense level pursuant to § 4B1.1(b)(3) (Career Offender) is 32. However, because his otherwise applicable offense level of 36 is greater than the applicable level under the career offender provision, pursuant to § 4B1.1(b), the total

offense level is 36. Mr. Coleman's Criminal History Category is VI, which combined with the total offense level, results in the sentencing guidelines range of 324–405 months of imprisonment.

### C.  Conclusion

For the reasons explained above, the Court—

1.  OVERRULES Mr. Coleman's objection to paragraph 4 of the PSR insofar as it challenges Mr. Coleman's role in the conspiracy but GRANTS the objection to the extent that the PSR describes Mr. Coleman's drug dealing operation as a DTO. The Court STRIKES any references in the PSR to Mr. Coleman belonging to a drug trafficking organization;

2.  OVERRULES Mr. Coleman's objection to paragraph 5 of the PSR;

3.  FINDS that Mr. Coleman's objection to paragraph 6 of the PSR has no bearing to the guidelines calculations or § 3553(a) sentencing factors;

4.  OVERRULES Mr. Coleman's objection to paragraphs 9, 12, and 13 of the PSR;

5.  OVERRULES Mr. Coleman's objection to paragraphs 19 and 20 of the PSR;

6.  OVERRULES Mr. Coleman's objection to paragraph 22 of the PSR;

7.  OVERRULES Mr. Coleman's objection to a 4-level increase in the offense level under § 3B1.1(a) as stated in paragraphs 27 and 28 of the PSR;

8.  OVERRULES Mr. Coleman's objection to a 2-level increase in the offense level under section § 3C1.1. The Court DIRECTS that paragraph 24 should state that the 2-level increase in Mr. Coleman's offense level is pursuant to § 3C1.1, not 2D1.1(b)(16)(D);

9. OVERRULES Mr. Coleman's objection to his base offense level of 24 under § 2K2.1(a)(2) as stated in paragraph 25 of the PSR. The Court DIRECTS that paragraph 25 should state that Mr. Coleman's predicate offenses under § 2K2.1(a)(2) are his two convictions for aggravated battery in Cook County case numbers 06CR0487901 and 06CR1661601 listed in paragraphs 54 and 55 of the PSR; and his conviction for manufacturing/delivering cocaine in Cook County case number 01CR1661502 listed in paragraph 51 of the PSR.

10. FINDS that Mr. Coleman is a career offender under § 4B1.1 and DIRECTS the PSR to be amended to include this finding;

11. OVERRULES Mr. Coleman's objection to a 4-level increase in the offense level under 2K2.1(b)(6)(B) as stated in paragraph 26 of the PSR;

12. SUSTAINS Mr. Coleman's objection to the Armed Career Criminal enhancement under § 4B1.4 as stated in paragraphs 29 and 30 of the PSR and STRIKES paragraphs 29, 30, and 45 from the PSR;

13. DIRECTS that paragraph 60 of the PSR should be changed to reflect that Mr. Coleman was convicted of the lesser included offenses of possession of controlled substances as reflected in the Government's Exhibit 4 (DE 351-4);

14. ORDERS the Probation Department to file an amended PSR that is consistent with the Court's conclusions 1–13.

SO ORDERED.

ENTERED: July 21, 2022

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court