UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 2:18-CR-101 JD |
| LAMONT COLEMAN | |

## OPINION AND ORDER

After a jury trial, Defendant Lamont Coleman was convicted of conspiring to distribute heroin, possessing with intent to distribute heroin, and being a felon in possession of a firearm. He was acquitted of two charges alleging distribution of heroin and one charge of possession of crack cocaine with intent to distribute. Following a preliminary sentencing hearing and change in counsel, Mr. Coleman has moved under Federal Rule of Criminal Procedure 33 for a new trial. He claims that, at the preliminary sentencing hearing, he obtained new evidence that could not have been obtained earlier and that probably would have led to his acquittal. He also maintains that the Government committed a *Brady* violation by suppressing evidence favorable to him. For the reasons explained below the motion will be denied.

### A. Factual Background

Mr. Coleman was charged in a third superseding indictment with multiple counts relating to illegal drug dealing and possessing a firearm as a felon. Before his trial, Mr. Coleman filed a motion to suppress and requested a *Franks* hearing, *see Franks v. Delaware*, 438 U.S. 154 (1978), to determine whether a criminal investigator lied in obtaining a search warrant for his residence. (DE 278.) However, he later abandoned his *Franks* argument and insisted instead that on its face the affidavit lacked probable cause for issuing a search warrant. The Court denied the

motion to suppress finding that none of the omissions that Mr. Coleman raised pertained to the veracity of the search warrant affidavit and weren't exculpatory in any case. In addition, the Court found that the information included in the search warrant affidavit stated probable cause upon which a search warrant could be issued. (DE 278)

Task Force Officer ("TFO") Dave Murray was the author of the search warrant affidavit. One of the paragraphs in the affidavit references a surveillance van that police parked outside Mr. Coleman's residence:

> In late June 2018, Investigators placed a surveillance van in front of 4120 and 4104 Madison. For 5 days, it recorded foot and vehicle traffic in the area. The recordings showed runners coming and going from the east door of the apartment building at 4104 Madison Street between the hours of approximately 8 a.m. and 9 p.m. on a daily basis. On numerous occasions, OWENS and/or Lamont COLEMAN exited the apartment building's south door and entered the ranch house next door at 4120 Madison. OWENS and/or Lamont COLEMAN only briefly stayed in the house before returning to the apartment building through the south door. Shortly thereafter, runners would leave 4104 Madison to deliver heroin.

(Search Warrant Aff. ¶ 21.)

In the background section of its ruling on Mr. Coleman's motion to suppress, the Court recounted various allegations stated in the search warrant affidavit, including those in the paragraph above. The Court paraphrased that paragraph as follows:

> For some time during the investigation, a video surveillance van was parked in front of the apartment building. The recordings show what appear to be drug runners going out and back in the east door of the apartment building between 8 a.m. and 9 p.m. Numerous times, either Mr. Coleman or Ms. Owens is seen to briefly enter the unoccupied house next door. Upon exiting, they return to apartment 1 through the south door, shortly after which the carriers leave for drug deliveries.

(DE 278 at 3.)

At the evidentiary hearing concerning Mr. Coleman's motion to suppress, TFO Murray testified that the investigators conducted extensive surveillance around Mr. Coleman's residence,

2

observing essentially the same activity that is noted in the search warrant affidavit.[1] (Mot. Suppress Hearing Tr., DE 283 at 18–19, 25–26.) TFO Murray did not refer to any video surveillance, and did not explain the surveillance methods, but it is clear that the investigators had first-hand information about the activity described in the search warrant affidavit.

\* \* \* \* \*

At trial, the Government presented multiple pieces of evidence that allowed the jury to conclude that the defendant was guilty of conspiring to distribute heroin, possessing with intent to distribute heroin, and being a felon in possession of a firearm. The Court will not recount all the evidence but here are some highlights. Mr. Coleman's then-girlfriend, Katrina Owens, testified that Mr. Coleman was in charge of the illegal drug distribution. She testified to her role in the conspiracy, including that Mr. Coleman gave her a phone and directed her to communicate with "runners" when someone called to purchase drugs. She said she would turn over the proceeds from the drug sales to Mr. Coleman.

Undercover Detective Bryan Slatton and confidential informant Mr. Maldonado testified that on two separate occasions they called Mr. Coleman to initiate a drug deal to purchase heroin, which subsequently led to the controlled buys between them and one of Mr. Coleman's runners. The phone calls and the controlled buys for both transactions were recorded and witnesses identified Mr. Coleman as the speaker on the other end of the line.

Agent David Zamora testified that it is common for a drug trafficking or distribution organization to use "runners" to facilitate the drug deals to insulate those in charge of the organization. Agent Zamora testified that the quantity of heroin found in Mr. Coleman's

---

[1] The affidavit itself confirms that, aside from the video surveillance van, the "[i]nvestigators had observed Katrina OWENS and Lamont COLEMAN conduct this same activity prior to several of the controlled purchases detailed above in this affidavit." (Search Warrant Aff. ¶ 21.)

3

residence was consistent with that of a drug dealer and not typical for personal use. He also testified that large amounts of cash, such as the nearly $20,000 recovered between Mr. Coleman's two properties are consistent with a drug distribution organization.

Detective Meredith Brockman identified a firearm recovered from under the mattress in Mr. Coleman's bedroom in his apartment at 4104 Madison Street. Ms. Owens testified that the bed was in fact where Mr. Coleman slept. There were also multiple pieces of evidence that Mr. Coleman owned both 4120 and 4104 Madison Street, including mail addressed to him and testimony from Ms. Owens.

At trial, Mr. Coleman's counsel cross-examined the Government's witness, Detective Slatton, about the surveillance van parked outside of Mr. Coleman's residence. Detective Slatton testified that the van was parked outside the residence for five days which the officers used for real time surveillance of the vicinity and also for recording the outside action. But, as it turned out, there was some issues with the video recording:

> Q. When did your surveillance—and when I say "you," I mean law enforcement in general – did there come a time when you actually parked the van out there with recording equipment?
>
> A. Yes.
>
> Q. Okay. And what kind of recording equipment did you have on that van or in that van?
>
> A. The van had a camera that recorded video, I believe, only that stayed out there for about three days, and it had real time access that as long as you were at that time watching it, you can pan the camera around to look around. Otherwise, it was just recording constantly.
>
> Q. Okay. And how long was that parked out there?
>
> A. Three days, I believe.
>
> Q. And there was something wrong with it, right, something broke down, the batteries?

4

> A. At some point, yes, I believe so maybe.
>
> Q. What were the results of the surveillance?
>
> A. The results of that surveillance, I believe, were of us seeing the runners constantly coming and going. I also believe Katrina Owens was seen on the video walking down the streets. Some other activity, I believe, with the vehicles outside.
>
> Q. Okay.
>
> A. I couldn't recall off the top of my head everything that was on that video for three days.

(Trial Tr., Vol. 1 at 104–105.)

In addition, Detective Slatton testified that before each controlled buy there was pre-buy and post-buy surveillance. (*Id*. at 91–92.) He was personally involved in multiple instances of surveillance, and there were a total of about eight officers involved. The surveillance established that there were five people, including the runners, who were living in the main building. (*Id*. at 62, 103–104.) Agents identified Augustine Pike and Tony Petty as two of the runners (*Id*. 62–64), and surveillance established that no one lived in the smaller building next door.

\* \* \* \* \*

At the preliminary sentencing hearing, Mr. Coleman's counsel cross-examined TFO Murray on the same subject. TFO Murray testified that a surveillance van was parked outside Mr. Coleman's residence to observe the area and to video-record the surveillance. (Prelim. Sent. Hrg. Tr., DE 370 at 50–51.) The officers took the recorded data and put it into a "software system" similar to a cloud-based program that then should have converted the videos into a tangible "recording" that could be disseminated to others. (*Id*. at 50–53.) However, there was a "technical issue" that prevented the program from transferring the data into a usable recording. (*Id*. at 51.) As a result, the software converted the data into a display that was "so fuzzy that you couldn't see if it was night, if it was day." (*Id*. at 51.) Though the DEA technicians tried to help

with the process, the final product was "useless," the software was "scrubbed," and there were no clear videos to be turned over to Mr. Coleman's counsel. (*Id*. at 51–53.)  In his motion for a new trial, Mr. Coleman claims that, until TFO Murray's testimony at the preliminary sentencing hearing, he did not know of the software malfunction which rendered the video recordings useless. He argues that, had he known this information, he would have likely been acquitted of all the charges.

### B. Legal Standard

Pursuant to Federal Rule of Criminal Procedure 33(a), "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "Courts have interpreted Rule 33 to require a new trial 'in the interests of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). However, subsections (b)(1) and (b)(2) place timing limitations for such motions. "Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict of finding of guilty . . . ." Fed. R. Crim. P. 33(b)(1). "Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2).

There are other limitations as well. Granting a motion for a new trial "is reserved for only the most extreme cases." *United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016); *see also United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021) (noting that the courts approach motions for new trial with great caution and are wary of second-guessing jury determinations).

"A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (quoting *United States v. Morales*, 902 F.2d 604, 605 (7th Cir.), *amended on other grounds*, 910 F.2d 467 (7th Cir. 1990)). "The ultimate inquiry is whether the defendant was deprived of a fair trial." *United States v. Friedman*, 971 F.3d 700, 713–14 (7th Cir. 2020) (quoting *United States v. Lawrence*, 788 F.3d 234, 243 (7th Cir. 2015)). In considering a motion for a new trial, "a court may properly consider the credibility of the witnesses, and may grant a new trial if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999). In doing so, "the court considers whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses." *Id*.

Mr. Coleman moved for a new trial long after the 14 days have passed since the guilty verdicts, so his argument can advance only on theories of newly discovered evidence.[2] *See United States v. Ogle*, 425 F.3d 471, 476 (7th Cir. 2005) (a motion for a new trial filed after Rule 33(b)(2)'s time limit has elapsed "is properly denied—even where a defendant alleges the knowing presentation of false testimony by the government at trial—unless that claim is based on 'newly discovered evidence.'"); *see also Eberhart v. United States*, 546 U.S. 12, 13 (2005) ("This deadline is rigid."). As a result, to prevail on his motion, Mr. Coleman must show that he has obtained new evidence that "(1) was discovered after trial, (2) could not have been discovered sooner through the exercise of due diligence, (3) is material and not merely

---

[2] Mr. Coleman's sentencing hearing has been delayed by multiple motions and matters outside the Court's control, including the change of counsel after the preliminary sentencing hearing, and now the instant motion that was filed by new counsel months after their appearance.

7

impeaching or cumulative, and (4) probably would have led to acquittal." *Coscia*, 4 F.4th at 465 (7th Cir. 2021) (quoting *United States v. O'Malley*, 833 F.3d 810, 813 (7th Cir. 2016)).

### C. Discussion

Mr. Coleman argues that he should be retried because, during the cross-examination of TFO Murray at the preliminary sentencing hearing, he learned for the first time that there were no video recordings of the police surveillance outside of his residence due to the malfunction of the recording system. (*See* DE 396 at 1.) He insists that he could not have discovered this evidence—that is, "that the surveillance recording equipment was 'basically useless'" (*id*. at 2)—sooner through the exercise of due diligence. He claims that, despite the absence of the video recordings, the Government's agents falsely referred to them in obtaining the search warrant affidavit and, then again at trial, in describing the activity outside of his residence. Mr. Coleman goes as far as to suggest that no video recording was done at all. (*Id*. at 2 ("[His counsel] was informed that the surveillance recording equipment at some point ceased working, but he was never informed that the equipment never recorded at all.").)

Mr. Coleman insists that the evidence that no video recordings are available for viewing is material to his case, and that it would probably have led to his acquittal. (Def.'s Mot. New Trial, DE 389 at 3.) In particular, he argues that "had there been disclosure to [his] counsel that the surveillance recording equipment totally failed, [Mr. Coleman] would have had more ammunition at the *Franks* hearing to challenge the search warrant." (DE 396 at 3.) He believes that, if the Court had been informed that there were no video recordings of the surveillance, "the Court's ruling on [his] motion would have been different." (*Id.* at 4.)

8

Finally, Mr. Coleman submits "[t]hat the failure of the [Government] to disclose to [him] prior to trial information about the lack of video recordings obtained from the surveillance van was in violation of the Government's obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972)."[3] Mr. Coleman believes that the Government suppressed the information about the total malfunction of the recording equipment and that no recordings existed. He is convinced that "[t]his information would have been favorable to [Mr. Coleman] because it could have been used by [him] at the *Franks* hearing, and at trial to impeach the credibility of the agent who testified about video recordings capturing criminal activity." (*Id.* at 5.)

The Court notes that, in relation to all of his grounds for a new trial, Mr. Coleman presents no comparable cases and his assertions are rather conclusory. Nevertheless, the Court has reviewed all of Mr. Coleman's claims thoroughly within the context of the applicable law. Having done so, the Court finds no basis for granting Mr. Coleman's motion for a new trial.

**(1)** *Mr. Coleman's Claim of Newly Discovered Evidence*

Mr. Coleman maintains that he learned only at the preliminary sentencing hearing that, due to the malfunction of the recording equipment, there were no video recordings from the surveillance van. He states that TFO Murray's affidavit falsely asserts that the surveillance van "recorded foot and vehicle traffic" outside his residence and that the "recordings showed runners coming and going." He says he had no reason to suspect that there was a complete malfunction of the surveillance equipment, and his attorney could not have discovered this information

---

[3] "According to *Brady*, the prosecution must disclose exculpatory evidence if it is both favorable and material to the defense. 373 U.S. at 87, 83 S.Ct. 1194. *Giglio* expanded the Brady rule to include impeachment evidence." *Collier v. Davis*, 301 F.3d 843, 848 (7th Cir. 2002).

9

sooner through the exercise of due diligence. In its response brief, the Government says that this evidence is not new, but does not back its contention with specifics.[4] No matter, even if the Court accepts these representations and finds that the evidence of failing to convert the recording data into usable videos is new and could not have been discovered sooner, Mr. Coleman has not shown that this evidence is material and probably would have led to acquittal.

Moreover, Mr. Coleman has failed to convince the Court that the evidence of failed conversion of the video recordings which resulted in the unavailability of the surveillance videos was material or that it probably would have led to acquittal. Mr. Coleman does not argue that admitting such evidence at trial would have helped him. And indeed, the trial value of this evidence is minimal. After all, the jury was already told that something was wrong with the recording equipment and trial evidence included no video recordings from the surveillance van. The evidence that none of the recordings were available because of technical malfunction would have been at best cumulative evidence. *See United States v. Young*, 20 F.3d 758, 763 (7th Cir. 1994) ("A new trial is not warranted where the newly discovered evidence is merely impeaching or cumulative."). Whether only some or none of the recordings were preserved would have made little difference to the outcome of Mr. Coleman's trial, given that no video recordings from the surveillance van were introduced into evidence, and the Jury had to rely on the witnesses' personal observations of what was happening outside Mr. Coleman's residence. Detective

---

[4] Although the Court is not addressing the question of whether Mr. Coleman's counsel learned about the malfunction of the equipment only after the trial, his question during Detective Slatton's cross-examination suggests otherwise: "And there was something wrong with [the recording equipment], right, something broke down, the batteries?" (Trial Tr., Vol. 1 at 104–105.) It's worth noting here that Mr. Coleman's suggestion that there were no recordings at all conflicts with trial evidence, and he does not provide any evidence in support of this assertion. As noted above, trial evidence and TFO Murray's testimony at the preliminary hearing establish that the investigators had real time access to the video feed from the surveillance van and the outside activity was being video-recorded. However, due to software problems, the recorded data failed to transfer into a usable format.

Slatton's trial testimony establishes that the investigators conducted real time surveillance before and after the controlled drug buys, as well as during various times in between, and personally saw the activity outside of Mr. Coleman's residence. (Trial Tr., Vol. 1 at 62–64, 91–92, 104–105.) His testimony was consistent with other evidence introduced at trial and consistent with the testimony of other witnesses. In short, given the weight of the evidence and the absence of evidence undermining the credibility of the officer's observations, it cannot be said that the evidence of total failure to transfer that resulted in the unavailability of the video recordings would probably have led to Mr. Coleman's acquittal. Insofar as the Court's "task is to determine whether the verdict is so contrary to the weight of evidence that a new trial is required in the interests of justice," *United States v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011), the Court finds no such contradiction. The weight of evidence supports the Jury's verdict.

Unable to argue that the "new evidence" would have made a difference at trial, Mr. Coleman contends that the evidence was material because he would have likely prevailed on his motion to suppress had his attorney known about the absence of the video recordings, which would have led to the exclusion of multiple pieces of evidence at trial.[5] In making this assertion, Mr. Coleman does not explain why he believes he would have prevailed on his motion to suppress. Having reviewed Mr. Coleman's arguments in support of his motion to suppress and the Court's ruling, the Court finds the additional evidence would not have changed the outcome of his motion. While the purported recordings may have bolstered the representations in the search warrant affidavit, they were not the only evidence supporting the search. The affidavit

---

[5] Insofar as Mr. Coleman's argument for a new trial is grounded on discovery of new evidence as opposed to his desire to merely revisit the Court's order on his motion to suppress, it is an appropriate argument within the context of Rule 33. *See United States v. Moses*, No. 08-C-1128, 2009 WL 78021, at *4 (E.D. Wis. Jan. 9, 2009) ("[I]it might be possible to base Rule 33 relief on newly discovered facts that would lead to the suppression of critical evidence and thus to acquittal . . . .") (citing *United States v. Woods*, 169 F.3d 1077, 1078 (7th Cir. 1999) (recognizing that Rule 33 would also be ground for retrial if newly discovered evidence "would lead to the suppression of critical evidence, and thus to the acquittal of a person who actually committed the crime").

11

contained the independent observations of the investigating officers and various other information establishing probable cause even without the paragraph in question. So even if Mr. Coleman were able to call into question the validity of the paragraph referring to the video recordings, the remainder of the search warrant affidavit supports a probable cause finding. *See Forman v. Richmond Police Dep't*, 104 F.3d 950, 964 (7th Cir. 1997) ("[A]n affidavit procured in part by tainted evidence is not necessarily invalid[,] because the untainted information, considered by itself, may establish probable cause for the warrant to issue.").

First, immediately after referencing the evidence collected via the surveillance van, the affidavit states that the "[i]nvestigators had observed Katrina OWENS and Lamont COLEMAN conduct this same activity prior to several of the controlled purchases detailed above in this affidavit." (Search Warrant Aff. ¶ 21.) The affidavit also alleges that Mr. Coleman used "KD" as an alias; a car registered to him was parked outside the residence; he had a driver's license registered to that address as well; a confidential source called KD on January 18 and again on February 6, 2018, to arrange heroin purchases and, soon after, heroin was delivered to him outside the house by another person; on February 19, an undercover agent arranged for a purchase of heroin, and when he arrived to the residence he called KD to let him know he was there—a moment later, another person came outside the building with heroin; the investigators saw Mr. Coleman and his then-girlfriend making multiple trips to a house next door, soon after which many of the drug transactions consummated. (Op. & Order, DE 278 at 2–3.) These allegations remain unrefuted; even without the video recordings from the surveillance van, there was sufficient probable cause that Mr. Coleman participated in illegal drug distribution, and thus sufficient basis to issue a search warrant. *See Illinois v. Gates*, 462 U.S. 213, 236 (1983) ("[S]o long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover

12

evidence of wrongdoing, the Fourth Amendment requires no more."); *Texas v. Brown*, 460 U.S. 730, 742 (1983) ("As the Court frequently has remarked, probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." (citation omitted)). It should also be noted that the Court entered its order on Mr. Coleman's motion to suppress after an evidentiary hearing where the parties had ample opportunity to examine TFO Murray. Having heard his testimony, the Court found no contradiction between what he said and what he put in the search warrant affidavit. Even now, Mr. Coleman has not shown "that the affidavit contained false statements or omissions made with deliberate or reckless disregard for the truth and that without these statements or omissions the remaining affidavit would have been insufficient to establish probable cause," which is a necessary condition to prevail on a motion to suppress challenging the validity of a search warrant affidavit. *United States v. Williams*, 718 F.3d 644, 650 (7th Cir. 2013).

      Importantly, while TFO Murray refers in the search warrant affidavit to "recorded foot and vehicle traffic in the area," Detective Slatton's trial testimony establishes that, while the recordings were ongoing, the officers monitored the video cameras and personally saw the activity outside Mr. Coleman's residence. He testified that the investigators "had real time access" and could control the cameras to look around. (Trial Tr., Vol 1 at 104–105.) So, the fact that TFO Murray is referring to the video recordings does not undermine the allegations regarding comings and goings outside of Mr. Coleman's residence. Also, as the Government points out, there's no evidence that TFO Murray knew about the conversion problem at the time

he submitted the search warrant affidavit, which was just two months after the observations conducted via the surveillance van.

In summary, even if he knew at the time of the application of the search warrant that the recording equipment in the surveillance van failed to produce tangible videos, Mr. Coleman would not have prevailed on his motion to suppress and the trial evidence would have been the same. Mr. Coleman has not established that the evidence is material or probably would have led to his acquittal. This is not one of the "extreme cases" to which the Seventh Circuit refers that requires a new trial. *See Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016) (granting a motion for a new trial "is reserved for only the most extreme cases").

### (2) *Mr. Coleman's Brady Claim*

Next, the Court considers Mr. Coleman's *Brady* claim. Such a claim is allowed under Rule 33. *See United States v. O'Malley*, 833 F.3d 810, 813 (7th Cir. 2016) ("We conclude that a post judgment motion based on newly discovered evidence which happens to invoke a constitutional theory can be brought under Rule 33(b)(1) or § 2255 . . . ."). "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. "Impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule." *U.S. v. Bagley*, 473 U.S. 667, 676 (1985). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). "A *Brady* violation can be broken down into three basic elements: (1) the evidence

at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued—in other words, 'materiality.'" *Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008).

Mr. Coleman argues that he suffered a *Brady* violation because the Government "suppressed information regarding the total malfunction of the recording equipment." (DE 396 at 5.) He states that "[p]retrial discovery documents created the false impression that the equipment actually recorded criminal activity over the course of several days, then discontinued because of mechanical failure." (*Id*.) He then circles back to his previous argument that, had he known about the faulty equipment, he would have prevailed on his motion to suppress and, consequently, at trial. He also claims that with this information, his counsel would have "seriously discredited" the Government's witnesses (*Id*. at 396), but does not explain in the least how that would have happened.

As already discussed, the evidence that a software glitch prevented the conversion of the video recordings into a usable format would not have made any difference in the outcome of Mr. Coleman's motion to suppress. As a result, trial evidence would have been the same, and there is no reasonable probability that the result of the trial would have been different, or that the Government would have elected to forgo trial in the first place. This means that, even if the Government withheld from Mr. Coleman evidence about the software glitch and the absence of the video recordings, he cannot claim that this was favorable evidence and that the Government violated his due process rights. *See Kyles*, 514 U.S. at 433 (defining favorable evidence in terms of a likelihood of a different outcome).

15

Likewise, disclosing the software glitch and the absence of the recordings at trial would not have materially helped Mr. Coleman. He states conclusively that his attorney would have been able to discredit the Government's witnesses but does not explain how. No evidence was presented to discredit the version of the offense presented by the investigators. But even assuming the video surveillance could have somehow discredited the Government's witnesses, his attorney already had such an opportunity. In cross-examining Detective Slatton, trial counsel touched on the fact that there was some issue with the recording equipment yet did not pursue this question any further. Also, clearly trial counsel was aware of the absence of recordings since none could've been produced through discovery. This undermines Mr. Coleman's current argument. After all, if he believes that evidence of technical malfunction could discredit the Government's witnesses, then his attorney would have pursued this issue whether the malfunction was partial or total. Clarifying at trial that the malfunction was total would not have materially changed Mr. Coleman's case, especially because there was no evidence of foul play or some other coverup of evidence unfavorable to the Government. Instead, such evidence would be cumulative at best. *Cf. United States v. Westmoreland,* 712 F.3d 1066, 1073–74 (7th Cir. 2013) (where the jury was told of the leading investigator's sexual affair with the defendant's wife, the evidence that the affair overlapped with the investigation would not have led to the defendant's acquittal). While *Brady* applies to suppressed evidence that would have impeached a witness, cumulative impeachment evidence is beyond its reach. *See United States v. Ervin*, 540 F.3d 623, 632 (7th Cir. 2008) ("And because the proof of [witness's] misconduct was merely cumulative impeachment evidence, [the defendants'] *Brady* claims necessarily fail.").

Furthermore, since the Government did not introduce any video from the surveillance, telling the Jury that no usable video recordings existed would have made no difference. Nothing

suggests the recordings were favorable to Mr. Coleman. Instead, Detective Slatton testified that the investigators had access to real time video streaming and personally saw the activity outside Mr. Coleman's residence. However, when the time came for the recordings to be converted to a usable format, they experienced a software failure. Such evidence is not evidence favorable to Defendant.

Due to the failure of data conversion, the Government did not introduce any video-recordings at trial and no witness testified to the availability of recordings. Mr. Coleman's counsel could have challenged the witnesses on the absence of the video-recordings especially since he knew that police dedicated a surveillance van for some time to Mr. Coleman's investigation and that the videos were unavailable. Such a challenge was available to Mr. Coleman regardless of whether he knew the exact reason why no video-evidence was introduced or available. In other words, if the Court were to grant Mr. Coleman's motion for a new trial, the only difference at trial would be the possibility of comment regarding the reason for the absence of recordings. But nothing suggests that would have had a material impact. The Court therefore does not find a *Brady* violation.

### D. Conclusion

For the reasons stated above, the Court DENIES Mr. Coleman's motion for a new trial (DE 389).

SO ORDERED.

ENTERED: June 5, 2023

/s/ JON E. DEGUILIO
Chief Judge
United States District Court

17